Filed 1/18/22  In re V.A. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re V.A., a Person Coming Under the Juvenile Court Law. | D078798 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>M.A. et al.,<br><br>        Defendants and Appellants. | (Super. Ct. No. J519862A; J519862B) |

APPEAL from an order of the Superior Court of San Diego County, Marion F. Gaston, Judge.  Affirmed.

M.A. and J.A., in pro. per., for Defendants and Appellants.

Daniel G. Rooney, under appointment by the Court of Appeal, for Appellant F.A.

Richard Pfeiffer, under appointment by the Court of Appeal, for Appellant J.S.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent San Diego County Health and Human Services Agency.

Nicole Williams, under appointment by the Court of Appeal, for Minors V.A. and L.A.

Marissa Coffey, under appointment by the Court of Appeal, for Non-dependent Minor J.A.

The maternal grandmother and grandfather (collectively, Grandparents), appeal from the juvenile court's order denying their request for placement of their granddaughters, V.A. and L.A., pursuant to Welfare and Institutions Code section 361.3.[1]  Grandparents contend the juvenile court abused its discretion by relying almost exclusively on only one factor—the best interest of the child—to deny their request for placement, and failing to give due consideration to the rest of the section 361.3 factors.  We conclude the juvenile court did not abuse its discretion, and therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

F.A. (Mother) has four children, none of whom are in her custody due to her long history of substance abuse and homelessness.  Mother signed over guardianship of her oldest child—a son, J.A. (born in January 2010)—to Grandparents in December 2014 through the Probate Court.  In November 2020, she also signed over guardianship of her youngest child—a son, R.A. (born in October 2020)—to Grandparents.[2]  This appeal concerns Mother's

_____

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     At the time of the hearings at issue in this appeal, the older son was 11 years old and the younger son was an infant.

2

two daughters, V.A. and L.A. V.A. was born in November 2017 to Mother and A.V. L.A. was born in January 2019 to Mother and J.S.

The Agency filed a juvenile dependency petition for V.A. on September 26, 2018 and for L.A. on January 23, 2019. The petitions were filed because V.A.'s parents were homeless and unable to care for her, and because L.A. tested positive for amphetamine when she was born.

The Agency began the Resource Family Approval (RFA) process[3] at around the same time for Grandparents and for V.A.'s paternal relatives (Aunt and Uncle, collectively the V's).[4] The V's were approved as a resource family in November 2018, and V.A. was placed with them on November 7, 2018. When L.A. was born in January 2019, it was presumed that V.A.'s father was also L.A.'s father.[5] Accordingly, she was also placed with the V's upon her release from the hospital three days after birth.

---

[3]    The RFA process is the process "for licensing foster family homes, certifying foster homes by licensed foster family agencies, approving relatives and nonrelative extended family members as foster care providers, and approving guardians and adoptive families." (§ 16519.5, subd. (a).) A "'resource family'" is defined to mean "an individual or family that has successfully met both the home environment assessment standards and the permanency assessment criteria" established by statute and the State Department of Social Services. (*Id.*, subd. (c)(1); *see id.*, subd. (d).) Only then are they "considered eligible to provide foster care for children in out-of-home placement and approved for adoption and guardianship." (*Id.,* subd. (c)(4)(A), see *id.*, subd. (c)(5).)

[4]    Uncle is the biological brother of V.A.'s father. Although L.A. is not related to the V's, we refer to them as Aunt and Uncle in this opinion for ease of reference.

[5]    Shortly after L.A.'s placement with the V's, DNA testing confirmed that V.A.'s father was not related to L.A. L.A.'s father was eventually located and confirmed as her biological parent in February 2020.

Unlike the V's, Grandparents were not approved as a resource family until two years after the RFA process began due to an issue stemming from a 2004 child welfare case involving the maternal grandmother and Mother. The Agency expressed " 'serious concerns' " about the issue in June 2019, and denied RFA approval due to a "non-exemptible" crime in September 2019.[6] Grandparents appealed and, in March 2020, were successful in securing a withdrawal of the charge. In July 2020, the Agency withdrew the RFA denial. After additional work, the Agency completed the RFA process and approved Grandparents as a resource family in December 2020.

V.A. lived with the V's from the time she was about 11 months old, and L.A. lived with them from the time she was three days old. During this time, Grandparents consistently maintained visitation with the girls, and the girls were able to spend time with their brothers during these visits.[7]

---

[6] Given the Grandparents' appeal and the Agency's subsequent withdrawal of its RFA denial, it is unnecessary to discuss the details of this incident.

[7] The visitation schedule varied throughout the dependency proceedings. After V.A. was detained, Grandparents had weekly unsupervised visits with her on Saturdays. Overnight visits with V.A. began in November 2018, progressing from one night per week to three nights per week. In December 2019, visitation was reduced to occur weekly from Friday morning to Saturday evening. The caregivers had reported that L.A. struggled with the previous expanded overnight visits; her routine was disrupted and it was difficult for her to readjust after her visits with Grandparents. Visitation was reduced to allow both girls to have a more structured routine in their home. Grandparents had virtual visits twice a week—lasting about 15 to 20 minutes per visit—between March and May 2020 due to the COVID-19 pandemic. In May 2020, Grandparents resumed in-person weekly visitation on Saturdays. In July 2020, overnight visits resumed from Friday morning to Saturday evening.

The Agency ultimately recommended that the parents' reunification services be terminated and a section 366.26 permanency hearing be set. Meanwhile, on August 21, 2020, Grandparents filed a request to change the court's prior placement order, noting that the Agency had recently withdrawn their RFA denial the prior month. Over the course of four nonconsecutive days in March and April 2021, the juvenile court considered Grandparents' request for placement pursuant to section 361.3 at the same time as the section 366.26 permanency planning hearing.

Prior to the hearings, the social worker (Judy Wonders) prepared written reports assessing Grandparents' request for placement and recommending that the children remain with the V's. The social worker reported that the children viewed the V's as their "parental figures," the V's were committed to providing a safe and stable environment for the children, and the girls were both thriving in their home. As to Grandparents, the social worker acknowledged that they love the children, they have consistently maintained visitation, and they have fostered a relationship with the girls' siblings. After addressing each of the statutory placement factors,[8] the social worker recommended that the children remain with the V's. As the social worker explained: "[L.A.] and [V.A.] have enjoyed approximately two years of safety, stability, nurturing, and love in [their] current relative placement. [V.A.] and [L.A.] have come to rely on their current relative caregivers to meet their psychological, developmental, and emotional needs and they have thrived in this home. [V.A.] and [L.A.] appear to share a secure attachment with their current relative caregivers as they have both been observed numerous times seeking out the relative caregivers for love,

---

[8]    These placement factors pursuant to section 361.3 are described *post*.

comfort, and to have [their] needs met."[9] The social worker further reasoned that the V's "have done an excellent job of supporting on-going sibling visitation and maintaining a family connection with the maternal grandparents," and that it would be in the girls' best interest to remain in their current home where they have resided for a majority of their lives and have thrived. The social worker indicated that she had observed the children in the home of the V's about 15 times, and in the home of Grandparents with J.A. about 10 times. Based on these observations, the social worker concluded Aunt and Uncle were the girls' primary parental figures and it could be detrimental to sever that relationship. The social worker acknowledged that, if moved "from the only home they have known," the girls' familiarity with Grandparents and their brothers would "help mitigate any trauma" resulting from the move. However, the social worker opined that this would be "an unnecessary trauma for the girls to endure, as they are happy and well cared-for in their current placement" and they "would suffer no negative impact by *not* being placed with their maternal grandparents and brothers." In reaching her conclusion that it was in the children's best interest to remain in their current placement with the V's, the social worker emphasized that the V's "have demonstrated over the past two years that they are committed to maintaining sibling and family connections."

Consistent with these written assessments, the social worker testified at the hearing that the relationship between the V's and the girls was a parent-child relationship and that the V's are the primary attachment figures

_____

9    The social worker referred at times to the "relative caregivers" for both children, but also clarified that they were "placed in a relative/[nonrelative extended family members] home." As previously indicated, the V's were related to V.A. but not to L.A., so they are nonrelative extended family members as to her.

6

in the girls' lives. The social worker opined that severing this relationship with the V's would create trauma and problems with loss and grief for the girls. She testified that the benefits of remaining with the V's were greater than the benefits of placing them in a home with their brothers. She also described the V's as the most flexible caregivers she has ever worked with over the course of 19 years, and stated they were "very willing to put their own feelings, their concerns aside when it comes to visitation for [V.A. and L.A.] to spend time with [J.A.] and the grandparents."

In both her written reports and testimony, the social worker described some concerns she had, primarily relating to Grandparents. The social worker indicated that Grandparents confronted the V's with the girls present about allowing (or " 'forcing' ") the girls to call the V's "mama and dada." The social worker tried to explain this was a natural part of child development, pointing out that the children also call the grandmother "mama," but the grandmother said the V's "shouldn't be expecting to be called mama and dada" and it was "not fair to [J.A.] for the girls to call the caregivers mama and daddy because it is just not fair to him."[10] The social worker was concerned that this caused emotional distress for the children, and Grandparents were "not concerned about any emotional stress or disturbance that gets created for the girls." The social worker was also concerned that Grandparents took V.A. and L.A. to the police station to report physical

---

[10]    The social worker thought J.A. was the motivating reason for Grandparents' request for visitation and placement "because everything is focused around [J.A.] wanting to be and needing to be with his siblings and not about the needs of [L.A.] and [V.A.]."

abuse because L.A. had a minor scratch or scab on her finger.[11]  The social worker indicated that this incident had a negative impact on V.A. and was "very stressful" for the girls.  V.A. was upset, sad, and had cried the next day because she was worried that she had lied to "Paw Patrol" (the police) about her caregiver.  The Agency viewed this as another example of Grandparents causing unnecessary emotional stress for the girls.  Based on Grandparents' negative comments and treatment of the V's, the social worker concluded it was "highly unlikely" they would allow ongoing visitation with the V's if the court placed the children with Grandparents.  The social worker explained Grandparents do not acknowledge the V's are family (referring to them instead as "the foster parents"); they described them as "bad guys or gangsters"; the grandmother admonished the children for greeting the V's as mama and dada; the grandmother described a "super hero" game the children play with them at their home where all family members are assigned a color, except the V's because they are the "bad guys"; and V.A. started calling Uncle a " 'loser' " after a visit with Grandparents, and L.A. told Aunt " 'you're not my mama.' "[12]

---

[11]  Grandparents reported that V.A. had told her brother that "dada hit [L.A.]" (possibly referring to Uncle).  The matter was referred to the Agency, which investigated the allegations and deemed them unfounded.  The social worker was not sure whether it was Mother who had called the police, but Grandparents were the ones who took the children to the police station.

[12]  On cross-examination, the social worker acknowledged Mother visits with V.A. and L.A. when they see Grandparents, and she would not be surprised if Mother "was telling her daughters, 'I'm your mom' " during these visits with Grandparents.  The social worker was not asked whether she concluded the children were repeating comments made by Grandparents or Mother, or comments made in Grandparents' presence during the visitation in their home.  The social worker later clarified that it was grandmother who had openly expressed her displeasure toward the V's in front of the children.

The court also heard testimony from two expert witnesses called by the children's counsel and Grandparents: Dr. Michael Joseph Perrotti, an expert in the field of sibling bond assessment and attachment; and Michael Jones, an expert on attachment and trauma issues.[13] Neither of these experts observed the children together with the V's. Dr. Perrotti spoke to the V's but Mr. Jones did not.

Dr. Perrotti conducted a bonding study based on 1.75 hours of observing the siblings, reviewing records in the case, and talking to Grandparents and the V's. Dr. Perrotti did not, however, separately assess V.A. and L.A.'s attachment with the V's.

Dr. Perrotti opined that the siblings' attachment indicates that their "developmental progression"—defined as "the path of development of a child"—was "very excellent" if the siblings were placed in the same home whereas it was "guarded to fair" if V.A. and L.A. remained with the V's. Based on the children's behavior with one another, Dr. Perrotti observed "group cohesiveness where the attachments and the ties between the siblings . . . are significant and they tie the group together." He emphasized his observations of J.A., noting for instance that J.A. met L.A.'s "self-soothing needs" by comforting her when she experienced distress after the grandmother left the room during the assessment. Dr. Perrotti explained that if the siblings were raised separately, V.A. and L.A. would not get the development of coping skills, mastery on tasks, and the commonality of experience that would come with living with J.A. He emphasized the

_____

13    Dr. Perrotti has Ph.D. degrees in psychology and clinical psychology, and his work includes providing expert opinions in court and performing sibling bonding studies. Mr. Jones is a psychotherapist and was previously employed for three years as "an adoptions worker for Child Welfare Services in San Diego."

importance of the sibling relationship given the trauma he believed the children had all suffered.[14]  Dr. Perrotti highlighted the experience of loss for the siblings, especially J.A., who expressed that his life was "not normal" without his sisters.

Dr. Perrotti acknowledged that the V's "are loving people who provide structure and routine for the children," but he disagreed with the Agency's description of a "parent/child relationship" between the V's and the children. Instead, he described it as "substitute attachments or caregivers but not parent/child relationships."  Dr. Perrotti also disagreed with the Agency's position that severing V.A. and L.A.'s relationship with the V's would result in the severance of loving and healthy "primary" parental figures.  While he recognized the V's as "significant" figures in V.A. and L.A.'s lives, Dr. Perrotti deemed J.A. to be the "primary" figure because of the biological ties.  In fact, Dr. Perrotti opined that the biological ties are "more significant" than the relationship between a child and caregivers with whom a child has lived since shortly after birth.

Mr. Jones was asked to assess the relationship between V.A. and L.A. and their brothers, as well as their relationship with Grandparents.  His assessment was based on observing the children with Grandparents for a

---

14    Dr. Perrotti stated:  "[T]hey've all been through trauma.  They've all been separated but they're connected in their relatedness.  I think that's the important thing."  He further explained that "the children have been through pretty significant trauma," and "the sibling group contributes to a restorative function of positive child development of the sibling members with each other against the backdrop of trauma and traumatic development."  During closing arguments, the children's counsel reiterated this theme, stating that "siblings with shared extensive trauma can provide self-soothing behaviors to each other."

total of four hours.  He did not review any court reports in making his assessment.

Mr. Jones opined that V.A. and L.A. had a primary attachment to Grandparents.  He described V.A. and L.A. as having a "developing, warm" relationship with J.A., which he described as a "secondary attachment because [J.A.] is slightly older."  According to Mr. Jones, the sibling relationship is the longest relationship people typically have and the benefits of growing up with siblings are great.  Mr. Jones explained that the benefits are better achieved when siblings live together as opposed to merely visiting one another.  He recognized that V.A. and L.A. would experience trauma if removed from the V's, but he opined that the harm would be short-term and would be lessened in light of the children's preexisting bond with Grandparents and their siblings.  He believed it would benefit V.A. and L.A. "a great deal" in the long-term to be placed with Grandparents.  This opinion was based on the daily sibling relationship that would be fostered if the children lived together, by the fact that Grandparents are relatives to both V.A. and L.A., and by the long-term contact with the rest of the maternal family.

After the experts' testimony, the court heard testimony from various family members, including the grandmother, Uncle, and the children's parents and brother.

The grandmother described the nature and extent of her interactions with V.A. and L.A. over the course of their lives.  The grandmother testified that she was present at the birth of both girls and in fact named L.A.  During their weekly visits, Grandparents had a routine with the children, which included taking J.A. to school and picking him up, taking naps, playing games, and going to the playground.  V.A. and L.A. also spent Christmas

11

with Grandparents in 2019 and joined them for an 11-day out-of-state family reunion. Grandmother testified that when they pick up V.A. and L.A. from the V's, the girls run excitedly to their car, and when they pull up to Grandparents' driveway, V.A. and L.A. raise their hands and say, " 'We're home.' " On those visits, V.A. and L.A. spend time with their brothers, see their Mother for supervised visits, and sometimes see their maternal aunt and uncle. When it is time to leave for the V's, V.A. will sometimes cry because she will miss J.A., but the grandmother tries to lessen any discomfort by encouraging them to enjoy themselves at the V's. The grandmother also described a "really, really close" relationship between J.A. and V.A., and stated J.A. is "soft and gentle" with L.A. She further noted that V.A. and L.A. have a playful relationship with their baby brother, R.A.

The grandmother expressed willingness to facilitate continued contact between the V's and the girls, and denied the majority of the incidents of concern expressed in the social worker's testimony and reports. She denied that the relationship between her and the V's was "contentious," describing it instead as "very cordial"; she denied that she had ever spoken badly to the children about the V's or V.A.'s father; she denied that V.A. and L.A. played a game in her home where the V's were labeled the "bad guys"; she denied once accosting Aunt after V.A. called her mommy; she denied telling V.A. to not call Aunt mommy; and she denied ever telling V.A. "that's not your mommy" (referring to Aunt). She explained that—although the girls call Grandparents "mama and papi"—she thought it was "confusing" for Aunt to tell the children "Come to mommy."[15] Regarding the incident involving the scratch or scab on L.A.'s finger, the grandmother testified that when she

---

[15]    The grandmother reasoned that it was not confusing for the girls to call her (the grandmother) "mama" because that is what J.A. calls her.

picked up L.A. from the V's, L.A. pointed out the injury to her and said, "Dada bite me." Once they arrived home, L.A. had a scheduled visit with Mother and repeated that "dada" hurt her. The grandmother explained that Mother was the one who first called the child abuse hotline and went to the police station to make a report; the police then requested to interview or speak with the children. The grandmother testified she and her husband did not know what to do. The grandfather called the social worker several times to report the incident. When he was unable to contact her on a weekend, Grandparents called the child abuse hotline too and were told to take the children to the police department. The grandmother, who is employed as a surgical assistant, described what she saw on L.A.'s finger as a "minor injury" in the category of other "scrapes and scratches" the children have gotten.[16]

Uncle testified about V.A. and L.A.'s life in their home. He recounted the ways that he and Aunt had taken care of the girls' daily needs, encouraged family traditions, and engaged them in household activities. He believed "very confidently" that V.A. and L.A. identify Aunt and Uncle as their parents because of the affection the V's provide and their constant presence in the girls' lives. He noted that the girls were in a loving home with "very strong relationships, very strong bond[s], trust . . . [,] routines, schedules, and a place of belonging," and they should live there "long-term." Uncle testified that V.A. and L.A. never mention Grandparents or their brothers when they are with the V's, never ask to call them, and tell the V's that they do not want to visit Grandparents "pretty much every week." Uncle described his efforts to encourage the girls to visit, and testified that he never requested a reduction in their visitation with Grandparents.

---

[16] Grandparents took a photograph of the finger and the Agency introduced the photograph as evidence at the hearing.

During his testimony, Uncle reiterated some of the same concerns as the social worker. He testified to having once witnessed the grandmother "sh[ake] her finger" in Aunt's face and "scold[]" Aunt for allowing V.A. and L.A. to call her " 'mom,' " while the children were present. He stated the grandmother sometimes corrected the girls when they called Aunt " 'mom.' "[17] Despite these issues, Uncle testified that he was willing to facilitate continued contact with Grandparents, the girls' brothers, and the girls' parents if the children were placed with the V's. When asked why the V's had not invited J.A. to spend time with the girls at their home more than once or twice, Uncle acknowledged it was maybe due to the "friction between both parties." He explained that both parties were "at fault" for not recognizing the importance of "encouraging outside activities besides the normal visits." He also stated he recognized it would be beneficial for the girls if Uncle initiated conversations about the brothers in their home, and he stated he would encourage such conversations if the girls were placed in their care.

The children's parents testified about their respective wishes for the girls' placement. Mother wanted the two girls to be placed with her parents and her two sons. L.A.'s father wrote a letter in November 2020 stating he wanted L.A. to be placed with Grandparents. The social worker testified, however, that she spoke to L.A.'s father in March 2021 and he expressed trust in the social worker as to where his child should be placed, and he was aware at that time that the social worker was recommending the children remain placed with the V's. V.A.'s father consistently maintained he wanted V.A. to be placed with the V's.

---

17    Aunt and Uncle also mentioned these and other concerns described by the social worker when they spoke to Dr. Perrotti.

14

The girls' 11-year-old brother, J.A., did not testify at the hearing; he instead read a two and a half-page, single-spaced typed letter into the record. He stated that he does not "feel like [his] life is normal," and expressed his desire to wake up in the same house as his sisters every day "not 1 or 2 days a week, but every day." J.A. recounted the games the children play together and fond memories he had with V.A. and L.A., describing this as "the best time [of] my life" because his sisters "stayed . . . from Wednesday to Saturday." He described holidays as a special time full of "so many traditions," adding "I understand that sometimes we have to share time with other family but I don't want to have to share all of those experiences." J.A. indicated he understood that the V's love his sisters, but stated "I do not believe I will have a relationship with them if they stay with the [V's]." He explained his reasoning: "You should know that the [V's] had never invited me anywhere until January of this year and my sisters have been living with them for over 2 years. . . . I know that they are saying that they would want to include me in my sisters['] lives but I believe that actions speak louder than words and the [V's] have just never made any attempt to get to know me or have me be part of my sister[s'] lives." J.A. also provided his views of the children's best interest, stating: "I think it is in [V.A.'s] and [L.A.'s] best interest to live with me because it['s] normal." He added, "I'm not normal—I don't know that I can ever be normal because I will always remember this pain of being separate from them but I do think they still can be normal" and "[a]ll I really want is to live with them."

15

The juvenile court heard closing statements on both the section 361.3 placement factors, and the section 366.26 permanent plan for the children.[18] The court recognized it was required to act in the best interest of the dependent children, "not in the interest of extended family members," and that "separating a child from a long[-]term primary caregiver can be deeply harmful psychologically." After expressly stating it had "consider[ed] each factor" in section 361.3, the court found "clear and credible evidence that it is in [V.A.'s] and [L.A.'s] best interest to stay in their current home" with the V's.

The court explained that "the passage of time is a significant factor in a child's life. The longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interest." Although the court recognized "[t]here is no question that both families . . . love the girls" and are able to care for them, it determined that "the best interest of the children weighs heavily in favor of the placement where they had lived since [V.A.] was 10 months old and [L.A.] was three days." While acknowledging that the V's were not biologically related to L.A., the juvenile court found that the V's have provided both children love, security, and stability, and they credibly testified they would put the children's needs first and foster their relationship with their maternal relatives.

Apparently responding to the expert testimony and argument about the trauma the children had experienced,[19] the juvenile court noted that the two

---

18     During its closing statement, the Agency specifically referred to its two written assessments of the section 361.3 factors, and asked the court to consider those two assessments.

19     See footnote 14, *ante*.

girls were "somewhat differently situated." "Despite references to what's been called [L.A.'s] trauma, her life has been mostly good. Since she was three days old she's been in a loving, stable home with her sister with a large group of reliable adults to care for her and play with her. On weekends and some holidays she sees her grandparents and her half-sibling[s] . . . . From her perspective, there is no problem to fix." As to V.A., the court noted that her "first 10 months of life were marked by chaos and instability, and exposure to drug use and domestic violence. But since her placement with the [V's]," her life had been positive just like her sister's. Against this backdrop, the court considered the possible trauma that would be inflicted "on these girls by removing them from the only home [V.A.] remembers and the only home [L.A.] has ever known[.]"

In considering this question, the juvenile court weighed all of the evidence and testimony before it. The court found the social worker's testimony to be "the most compelling." The court agreed that "moving the girls would create unnecessary loss and grief while leaving them in their current home allows them the stability and permanence along with the chance to grow their relationships with their maternal relatives, including their half-brothers."

By contrast, the court "mostly rejected" Dr. Perrotti's and Mr. Jones's testimony. Although the court agreed with Dr. Perrotti that V.A. and L.A. are bonded to their brother J.A., the court found Dr. Perrotti "less credible" when he opined on the relative strength of their attachment to J.A. as compared to their attachment to the V's—particularly because Dr. Perrotti had never observed the children together with the V's. The court noted that Dr. Perrotti had spent minimal time observing the children with their brother, yet he opined that this "sibling bond was more important than the

17

children's bond with the adults who've been caring for them for two years." The court also commented that Dr. Perrotti incorrectly "seemed to believe that the children had lived together at some point, then were separated, creating trauma for all of them . . . ." "Even after acknowledging that the children had never lived under the same roof, [Dr. Perrotti] persisted in testifying in terms of a separation creating trauma," but there was "no evidence that the girls [were] traumatized by having never lived with [J.A.]" The court also found that Dr. Perrotti's testimony concentrated on J.A.'s needs and potential distress, which was not the court's focus under the governing law. Further, the court found Dr. Perrotti "nonresponsive to straightforward questions" and concluded he was "openly dismissive" of the possibility that V.A. and L.A. may be harmed if removed from the V's. The court found his position that "11-year-old [J.A.] could provide a secure base for the girls" to be "implausibl[e]" and "baffling"—noting that this "places an unusual burden on [J.A.], as the secure base referred to in attachment theory is between a child and a parent, not a sibling" and "[J.A.] is not responsible for his sisters' sense of security." The court also rejected Mr. Jones's testimony, finding "the foundation of his opinion [to be] unsound" since he did not analyze the bond between V.A. and the V's, did not read any of the court reports, and never spoke to the V's.

Similarly, the juvenile court found the grandmother's testimony "less than helpful." The court "fear[ed] that [grandmother]'s protectiveness over [J.A.] and her desire to have all four children in her home has eclipsed her ability to see or speak the truth." The court found the grandmother "did not testify credibly, completely contradicting multiple witnesses, and at times

18

seeming to testify from prepared statements." The court also was concerned that she, or another adult, helped draft portions of J.A.'s statement.[20]

By contrast, the juvenile court found that Uncle "testified credibly" that he and Aunt provided V.A. and L.A. with "routine, strong relationships, and a sense of belonging." Uncle also "credibly" testified that he valued the relationship between V.A. and L.A. and their brothers, and he "humbly" acknowledged that both families contributed to friction in the case. As to that friction, the court found no evidence that the V's had ever disparaged Grandparents, complained about them, or falsely accused them of child abuse. On the other hand, the court found credible evidence that Grandparents had engaged in all those behaviors. The court was particularly "disturbed" that the grandmother had taken the children to a police station to report that Uncle harmed L.A. The court found this demonstrated "profoundly poor judgment and an inability to put the children's needs above her own"—which would not "bode well for future contact between the families if the [Grandparents] were to have custody of the children."

The juvenile court also recognized the benefit to V.A. and L.A. in maintaining a close relationship with their brothers, J.A. and R.A. However, it found that the relationship had already been "developed and nurtured" while the siblings lived apart. The court noted the social worker's testimony that "in her work with more than 200 families, she has never encountered a family as flexible about visitation as the [V's]." The court further found that

---

[20] The court found it was understandable to provide some assistance to J.A., but under the circumstances the court could not "tell where the [Grandparents'] preferences stop and [J.A.'s] begin" and it hoped that J.A. was not "harmed . . . too much" by "being placed in the middle of this process."

the children were "happy and emotionally and developmentally on track" and had thrived in their current home with the V's.

Based on its consideration of all the evidence and testimony, the juvenile court denied placement with Grandparents, terminated parental rights, and designated the V's as the prospective adoptive parents. Grandparents appealed.

DISCUSSION

The sole issue presented in Grandparents' appeal is whether the juvenile court erred by failing to properly apply the relative placement preference under section 361.3. Specifically, Grandparents claim the juvenile court did not consider all the criteria set forth under section 361.3, and if it had, it would have placed the children with Grandparents. We disagree.

A. *Governing Legal Principles*

Section 361.3, subdivision (a) provides that "[i]n any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative."[21] For purposes of this section, " '[p]referential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c).) "If the court does not place the child with a

_____

[21] A " '[r]elative' " is defined as "an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship, including stepparents, stepsiblings, and all relatives whose status is preceded by the words 'great,' 'great-great,' or 'grand,' or the spouse of any of these persons even if the marriage was terminated by death or dissolution." (§ 361.3, subd. (c)(2).) The grandparents (as to both children) and the V's (as to V.A.) meet this definition and therefore qualify for preferential consideration as a relative placement under the statute. (*Ibid.*) As to L.A., the V's are nonrelative extended family members. (§ 362.7.)

relative who has been considered for placement pursuant to this section, the court shall state for the record the reasons placement with that relative was denied." (§ 361.3, subd. (e).) "The relative placement preference, however, is not a relative placement *guarantee*." (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 798 (*Joseph T.*).) And it does not create a presumption that a child will be placed with a relative. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 320-321 (*Stephanie M.*).)

"When considering whether to place the child with a relative, the juvenile court must apply the placement factors, and any other relevant factors, and exercise its independent judgment concerning the relative's request for placement." (*In re Isabella G.* (2016) 246 Cal.App.4th 708, 719 (*Isabella G.*).) The placement factors include (1) the best interest of the child; (2) the parents' wishes; (3) proximity of the placement so as to facilitate visitation and reunification with the parents; (4) placement of any siblings and half-siblings in the same home; (5) the good moral character of the relative; (6) the nature and duration of the relationship between the child and relative; (7) the relative's ability to provide appropriate and safe care of the child and facilitate visitation with the child's other relatives; and (8) the

safety of the relative's home.  (§ 361.3, subd. (a)(1)-(8).)[22]  However, "[t]he linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor." (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862-863 (*Alicia B.*).)  In addition, before placing a dependent child in a relative's home, the Agency must determine whether the relative can be approved as a resource family.  (See § 16519.5, subd. (c).)  However, "[a]pproval of a resource family does not guarantee an initial,

---

[22]  More specifically, the nonexhaustive list of factors a court must consider when determining whether placement with a relative is appropriate are:  "(1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs.  [¶]  (2) The wishes of the parent, the relative, and child, if appropriate.  [¶]  (3) The provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement.  [¶]  (4) Placement of siblings and half siblings in the same home, unless that placement is found to be contrary to the safety and well-being of any of the siblings, as provided in Section 16002.  [¶] (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect.  [¶]  (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful.  [¶] (7)  The ability of the relative to do the following:  [¶]  (A) Provide a safe, secure, and stable environment for the child.  [¶]  (B) Exercise proper and effective care and control of the child.  [¶]  (C) Provide a home and the necessities of life for the child.  [¶]  (D) Protect the child from his or her parents.  [¶]  (E) Facilitate court-ordered reunification efforts with the parents.  [¶]  (F) Facilitate visitation with the child's other relatives.  [¶]  (G) Facilitate implementation of all elements of the case plan.  [¶]  (H)(i) Provide legal permanence for the child if reunification fails.  [¶]  (ii) However, any finding made with respect to the factor considered pursuant to this subparagraph and pursuant to subparagraph (G) shall not be the sole basis for precluding preferential placement with a relative.  [¶]  (I) Arrange for appropriate and safe child care, as necessary.  [¶]  (8)(A) The safety of the relative's home." (§ 361.3, subd. (a).)

continued, or adoptive placement of a child with a resource family or with a relative or nonrelative extended family member." (§ 16519.5, subd. (c)(6).)

We review the juvenile court's determination regarding a child's placement under section 361.3 for abuse of discretion. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067, superseded by statute on other grounds as stated in *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032 (*Cesar V.*).) "Broad deference must be shown to the trial judge. The reviewing court should interfere only ' "if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." ' " (*Robert L.*, at p. 1067.)[23]

B. *Analysis*

Grandparents' primary argument on appeal is that the juvenile court erred by treating a single placement factor—the best interest of the child—as dispositive and failing to consider the remaining factors. We conclude the juvenile court did not err in considering Grandparents' request for relative placement. The parties presented extensive evidence and argument regarding each of the placement factors. The court expressly stated that it "consider[ed] each factor" pursuant to section 361.3, and it summarized its

---

[23]     In general, the section 361.3 relative placement preference applies when making the initial placement decision *and* during the subsequent dependency period before parental rights are terminated. (See *Isabella G.*, *supra*, 246 Cal.App.4th at pp. 719-723; see also *Cesar V.*, *supra*, 91 Cal.App.4th at p. 1032; *Joseph T.*, *supra*, 163 Cal.App.4th at p. 797.) The relative placement preference does not apply after the juvenile court has held a permanency planning hearing under section 366.26. (*In re Maria Q.* (2018) 28 Cal.App.5th 577, 593, 596 (*Maria Q.*).) Here, the juvenile court considered the placement request at the same time as the permanency planning hearing, and the parties did not object to proceeding in this manner.

stated reasons for denying Grandparents' request for relative placement in a detailed, thorough, and thoughtful manner. (See § 361.3, subd. (e).)

To support their claim of error, Grandparents contend the juvenile court placed too much emphasis on the best interest of the children and the length of time the children had spent living with the V's. But these are precisely the factors the court was required to consider. (§ 361.3, subd. (a)(1).) "As the court explained in *In re Lauren R*. [(2007)] 148 Cal.App.4th [841] at page 855, '[t]he overriding concern of dependency proceedings . . . is not the interest of extended family members but the interest of the child. "[R]egardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected." [Citation.] Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests. [Citation.] The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests.' " (*In re M.H.* (2018) 21 Cal.App.5th 1296, 1303-1304 (*M.H.*).) While not dispositive in every case, it is well established that "[t]he linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor." (*Alicia B.*, *supra*, 116 Cal.App.4th at pp. 862-863; see *In re Jessica Z.* (1990) 225 Cal.App.3d 1089, 1100 [affirming juvenile court's ruling denying grandmother's request for a relative placement preference under section 361.3 where the child "had lived with her foster family for almost a year—almost her entire life" and it "would have been detrimental to remove [her]"].) The court did not err in performing an analysis consistent with this established case law.

24

Contrary to Grandparents' assertion, the record does not reflect that the juvenile court ignored the remaining placement factors or failed to perform its own independent assessment of them. The relative placement preference under section 361.3 was thoroughly litigated and argued, and the court carefully considered all of the evidence before it. (Compare *In re N.V.* (2010) 189 Cal.App.4th 25, 29 [finding error where juvenile court excluded information relevant to a placement decision under section 361.3] with *In re H.G.* (2006) 146 Cal.App.4th 1, 16 [neither the agency nor the court considered the applicable section 361.3 placement factors].) The fact that the court followed the Agency's recommendations does not mean that it failed to independently consider "the facts and evidence presented in the case" regarding the section 361.3 placement factors, as Grandparents allege. Instead, the record reflects that the court independently and carefully examined the evidence and determined that the section 361.3 factors weighed against placement with Grandparents. (See *Maria Q.*, *supra*, 28 Cal.App.5th at pp. 599-600 ["Although the juvenile court did not formally consider the section 361.3 factors, the juvenile court's remarks indicate it conducted a multifactorial assessment of [the minors'] best interests."].) The court found that it was in V.A.'s and L.A.'s best interest to remain with the V's, with whom they had lived for more than two years of their young lives. The court found the V's to be reliable and loving caretakers who had provided a home where the children were thriving and all of their needs were being met. As for Grandparents' moral character, the juvenile court questioned their judgment after they took V.A. and L.A. to the police station to report abuse. The court found the grandmother's testimony lacked credibility and further found that Grandparents had disparaged the V's, demonstrating "profoundly poor judgment and an inability to put the children's needs" first. The court

concluded this type of behavior, outlined *ante*, and summarized in the written assessments evaluated by the court, did not "bode well for future contact between the families if the [Grandparents] were to have custody of the children."

Grandparents address the remaining placement factors and argue each one establishes that placement with them is appropriate. They contend most of the parents and relatives support placement with them (§ 361.3, subd. (a)(2)); they are an appropriate placement because they are related to the children (*id.*, subd. (a)(3)); they are the only home where V.A. and L.A. can be with siblings (*id.*, subd. (a)(4)); they are of good moral character (*id.*, subd. (a)(5)) because they "are exactly the type of relatives one hopes a dependent child will be placed with"; they are committed to providing permanency and have existing close bonded relationships with the children (*id.*, subd. (a)(6)); and they have a safe and stable home and are willing to facilitate visitation with relatives (*id.*, subds. (a)(7)-(8)). But the question before us is not whether a reasonable judge might have reached a different decision. " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.) The juvenile court "was fully aware of the difficulty of the choice and, with the parties before it, [and] was best able to make the hard call of which placement, under the circumstances as they then existed, was in the minor's best interest." (*M.H.*, *supra*, 21 Cal.App.5th at p. 1305.) As an appellate court, we do not reweigh the evidence or make credibility findings contrary to those of the juvenile court. (*Alicia B.*, *supra*, 116 Cal.App.4th at p. 864.) We conclude the court here properly exercised its

broad, independent discretion to deny Grandparents' placement request. It was not unreasonable for the court to weigh the required statutory factors and conclude it was in the children's best interest to remain in their successful and stable home with the V's.

Grandparents repeatedly emphasize that they are the only ones who can provide a relative placement—for both girls—that will allow all four siblings to live together. Grandparents are correct that dependency law generally favors placing a child with relatives. In this case, V.A. *was* placed with relatives—Aunt and Uncle. While L.A. was not related to the V's, she too was placed with a sibling, her sister V.A., allowing her to remain in the only home she had ever known.[24] The juvenile court was not required to place the children in the home that contained the greatest number of siblings where it concluded that such a placement would not be in the children's best interest. The court recognized that Grandparents clearly love V.A. and L.A. and that the girls' relationship with their brothers was beneficial, but it also recognized that the strong bond between the siblings had already been "developed and nurtured" while living apart and that, in any event, it did not outweigh the trauma of being separated from the V's. The record before us does not reflect that, in performing this difficult assessment, " ' "the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.)

---

[24] The children's counsel acknowledged that L.A. should not be placed with Grandparents if V.A. stayed with the V's; counsel argued the children should be placed with Grandparents but regardless of their placement, they should remain together.

We reject Grandparents' remaining contentions that the juvenile court's findings were not supported by the experts' testimony, and that the court displayed bias in rendering its decision. Grandparents' record citation to virtually all of the testimony of Dr. Perrotti and Mr. Jones—spanning over 100 pages—is unhelpful. (See *Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205 [disapproving of appellant's use of a "block page reference" to support argument].) Regardless, the juvenile court was not required to accept these experts' testimony and it explained its reasons for rejecting their opinions. We discern no abuse of discretion based on the court's evaluation of the expert testimony. We further conclude Grandparents have not shown the court was biased against them. The record

citation in Grandparents' opening brief does not support this assertion, and our review of the entire record does not support any claim of bias.[25]

In sum, we conclude the juvenile court properly and fully considered Grandparents' request for placement, and it did not abuse its discretion in denying their request under section 361.3.

---

[25] Grandparents cite other examples of the court's alleged bias in their reply brief. Although we are not required to consider this argument raised for the first time in reply (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 157-158), we have reviewed Grandparents' claims and discern no bias or prejudice by the juvenile court against any of the parties, counsel, or witnesses. Similarly, we are not persuaded by Grandparents' arguments in their supplemental briefing after they received additional portions of the record cited in the Agency's respondent's brief. Grandparents object to the Agency mentioning a " 'conviction' " or "non-exemptible" crime in some reports, when "no conviction existed" at the time of those reports. But it is not unreasonable for the Agency to include historical information which explains the procedural history of the case, and the Agency made clear this offense "ha[d] been removed from the record." Grandparents had the opportunity to address their other contentions—regarding alleged delays in the RFA process and the Agency's concerns regarding the police station incident—in their opening brief and at the court hearings. We do not consider these arguments further here, except to reject Grandparents' claim that this shows bias or that the juvenile court erred. Finally, Grandparents contend a record citation does not support the Agency's statement that the court granted Aunt and Uncle de facto parent status. This is not relevant to our evaluation of the court's ruling, but we note it is clear from the reporter's transcript that the court did grant Aunt and Uncle de facto parent status in December 2020.

## DISPOSITION

The order of the juvenile court is affirmed.

GUERRERO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.